UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW MEXICO

In re:
TROY MICHAEL BAILLIO and
JASMINE BAILLIO,
     Debtors.                       No. 7-08-12171 JA

JAMES RICHARD BERNAL,
     Plaintiff,
v.                               Adv. No. 08-1125 S

TROY MICHAEL BAILLIO and
JASMINE BAILLIO,
     Defendants.

**MEMORANDUM OPINION AFTER
TRIAL ON THE MERITS**

This matter came before the Court for two days of trial on the merits of Plaintiff's Complaint objecting to the dischargeability of his debt under Section 523(a)(2). Plaintiff was represented by Cuddy, Kennedy, Ives, Archuleta-Staehlin, Fairbanks & Vigil, LLP (Daniel J. Behles[1]). Defendant was represented by Moore, Berkson & Gandarilla, P.C. (George M. Moore and Aren E. Berkson). This is a core proceeding to determine the dischargeability of a debt. 28 U.S.C. § 157(b)(2)(I).

**INTRODUCTION**

This adversary proceeding is Plaintiff's request to declare that a certain debt owed to him is nondischargeable in the Defendants' Chapter 7 bankruptcy. The complaint alleges that in 2007 Troy Baillio executed a promissory note to him in the principal amount of $250,000. He further claims that at the time

_____

[1]After trial, Daniel J. Behles became associated with Moore, Berkson & Gandarilla, P.C.

Troy Baillio made certain representations to him that were false, and were known by him to be false.  These representations were: 1) the loan would be secured by a third lien on a residence at 8020 Rio Grande Blvd. NW, Albuquerque, New Mexico; 2) the home had been appraised at and had a value of $3,300,000 or more; 3) he had in excess of $1,000,000 equity in the home; 4) the home was subject to a contract of sale that would close within 10 days; 5) the home was his separate property[2]; 6) the prospective purchaser was known to Troy Baillio, had been approved for a loan, and there were no impediments to closing; and 7) Baillio had an alternative source of repayment for the loan if the house sale did not close.  The complaint further alleges that Bernal relied on each representation in agreeing to make the loan, and has been damaged thereby because the loan has not been paid.

**EXHIBITS**

As the first matter of business at trial, the parties submitted joint exhibits and stipulated to admission of Exhibits 1-24 and 27-30.  During trial, Exhibits 25, 26, and 31-36 were admitted.  This case is heavily exhibit driven, so the Court will review the exhibits first.

Exhibit 1 is a Commitment by Lawyers Title Insurance Corporation to issue a policy of title insurance in favor of a mortgagee to be determined, effective March 27, 2007, for

---

[2]This allegation was withdrawn during the trial.

Case 08-01125-s    Doc 22    Filed 04/15/11    Entered 04/15/11 17:09:58 Page 2 of 32

property described by metes and bounds located in Tract 72-B and Tract 96 of the Middle Rio Grande Conservancy District Map No. 25 ("8020 Rio Grande").  The Commitment states that the land is vested in fee simple in Troy Baillio, a married man as his sole and separate property.  Schedule B-1, Requirements, states that taxes for the year 2006 were due.  Schedule B-2, Exceptions, states as item 13 that there is a mortgage dated January 23, 2006 in favor of Suntrust Mortgage, Inc. executed by Troy Baillio, a married man as his sole and separate property, in the amount of $1,750,000.00, recorded January 27, 2006.  Item 14 states that there is also a mortgage dated May 8, 2006, in favor of Peoples Bank, executed by Troy Baillio, a married man as his sole and separate property, in the amount of $350,000.00, recorded May 17, 2006.

Exhibit 2 is a letter dated April 18, 2007, from Arthur L. Silva, Qualifying Broker of Sunwest Mortgage Home Loans ("Sunwest Mortgage") in Albuquerque, New Mexico addressed It states that Sunwest has received a loan application from Mr. Andrew McBride for the purchase of 8020 Rio Grande.  It also states that, after a review of the application and supporting documents and credit report and income, Sunwest has granted conditional approval for up to 85% of the purchase price subject to:

| 1. | Loan amount not to exceed $2,635,000.00 |
|----|------------------------------------------|

Case 08-01125-s    Doc 22    Filed 04/15/11    Entered 04/15/11 17:09:58 Page 3 of 32

| 2. | Appraisal review with determined value of at least $3,100,000.00 |
|---|---|
| 3. | Fully executed purchase agreement |
| 4. | Preliminary Title Binder |
| 5. | Final Underwriting approval. |

Exhibit 3 is a letter, undated, from Arthur Silva, CEO and President of Sunwest Mortgage addressed "To Whom It May Concern". It states that it is in conjunction with the mortgage loan for Andrew McBride on 8020 Rio Grande. "All lender conditions have been cleared and docs are being sent to the title company for closing. Per the purchase contract the closing is scheduled for May 4, 2007."

Exhibit 4 is a Purchase Agreement for Residential Resale. It shows an offer date of April 4, 2007 from Andrew McBride to Troy Baillio for 8020 Rio Grande. The purchase price is $3,300,000. It calls for an approximate cash down payment of $495,000 and a loan of $2,805,000. It states that the buyer will deliver $50,000 earnest money to be escrowed at US Title Company. The Purchase Agreement also includes the purchase of "All Furnishings." The Purchase Agreement calls for a settlement date of May 3, 2007 and funding on May 4, 2007. It also calls for an appraisal and provides that if the appraisal is less than the purchase price, the buyer is excused from performance and may recover the earnest money. The Seller was required to obtain a title commitment from US Title. The Purchase Agreement was

Page -4-

signed by Andrew McBride as Buyer on April 4, 2007. Troy Baillio as Seller accepted the offer and signed off but did not list a date or time.

Exhibit 5 is a Uniform Residential Appraisal Report for 8020 Rio Grande with an effective date of June 26, 2006 that values the property at $3,000,000.

Exhibit 6 is a copy of two checks. The first is check number 1351, dated April 26, 2007, payable to James R. Bernal for $15,000 and drawn on account #4294 of Troy Baillio and Jasmine Baillio for "Points". The second is check number 1352, dated April 26, 2007, payable to Dave Carlberg for $5,000 and drawn on the same account and also for "Points".

Exhibit 7 is a Promissory Note ("Note") dated April 27, 2007 from Troy Baillio as Borrower to James R. Bernal for $250,000 plus interest at the rate of 8.5% per year beginning on April 27, 2007. It is payable as follows: 1) if the principal balance is repaid in full on or before 5:00 PM of the seventh day after the Note, no interest is due; 2) if the principal is not repaid in full by the seventh day, interest only shall be paid weekly beginning on May 11, 2007 and continuing on the same day each week until the Note is paid in full; 3) the entire principal and all accrued unpaid interest is due on or before June 27, 2007. The Note is immediately due and payable at the option of the holder without notice or demand if any payment required is not

Page -5-

paid when due, if any representation or warranty contained in the Mortgage[3] is untrue, or if there is a breach of any covenant contained in the Mortgage.  The Note also states that the it may be prepaid without penalty and that it is secured by a mortgage on 8020 Rio Grande and by a deed to said property held by James R. Bernal.

Exhibit 8 is a document dated April 26, 2007 entitled "Mortgage Deed."  It states, in part:

> This Mortgage is given by Troy M. Baillio ... [to] James R. Bernal ... to secure the payment of the PRINCIPAL SUM of ($250,000.00) Two-Hundred Fifty Thousand and 00/100 together with interest thereon computed on the outstanding balance, all as provided in a Note having the same date as this Mortgage, and also to secure the performance of all the terms, covenants, agreements, conditions and extensions of the Note and this Mortgage.
>     In consideration of the loan made by [Bernal] to [Baillio] and for the purpose expressed above, [Baillio] does hereby grant and convey to [Bernal], with MORTGAGE COVENANTS, [8020 Rio Grande].
>         [Baillio] further covenants and agrees that
>         [10 other items, including payment of
>         attorney fees in the event of default]
> This Mortgage is upon the STATUTORY CONDITION and the other conditions set forth herein, for breach of which [Bernal] shall have the STATUTORY POWER OF SALE to the extent existing under State Law.

Exhibit 8 was signed by Troy M. Baillio, notarized, and filed for record in the Bernalillo County records as document # 2007062345 on April 27, 2007.

---

[3]The term "Mortgage" is defined later in the Note as a mortgage on 8020 Rio Grande.

Exhibit 9 is check 1408 on account #9294 signed by Troy Baillio payable to James R. Bernal in the amount of $265,000.00 dated May 22, 2007 and returned NSF.

Exhibit 10 is Default Judgment dated May 9, 2008, in Case No. CV 2007-07719, Bernalillo County, Second Judicial District Court, New Mexico, in <u>Bernal v. Troy M. Baillio and Jasmine Baillio</u>. The judgment is for $273,063.78 and provides for interest at 8.5% from and after April 25, 2008.

Exhibit 11 is a Release of Mortgage executed by High Desert State Bank ("HDSB") on February 15, 2006 for a second mortgage executed by Troy Baillio on December 30, 2004 for 8020 Rio Grande. It was filed for record in the Bernalillo County records on February 27, 2006 as document # 2006027381. This exhibit is not relevant.

Exhibit 12 is a Line of Credit Mortgage executed on October 31, 2006 between Troy and Jasmine Baillio, as husband and wife, to lender HDSB for 8020 Rio Grande. It states that it will have a maximum obligation limit of $920,000.00. It secures a Promissory Note dated October 31, 2006 executed by Troy and Jasmine Baillio in the amount of $920,000 with a maturity date of November 30, 2006. It also secures future advances. It was filed for record in the Bernalillo County records on October 31, 2006 as document # 2006166455.

Exhibit 13 is a Loan Modification Agreement dated December 26, 2006, between HDSB and Troy and Jasmine Baillio. It states that the borrowers executed and delivered to the bank a promissory note in the amount of $920,0000 dated October 31, 2006, and as a means of securing the note executed and delivered a Mortgage which was recorded in Bernalillo County on November 2, 2006 as document # 2006167545 and a mortgage dated October 31, 2006 which was recorded in Bernalillo County but the "recording information not yet received." The parties amended the October 31, 2006 note as follows:

| 1. | The maturity date is extended to January 30, 2007. |
|----|----|
| 2. | The current balance is $914,202.20 |
| 3. | The interest rate remains at WSJP + 1.00 (currently 9.25%) |
| 4. | Principal and Interest to be paid in full at maturity on January 30, 2007. |
| 5. | A modification fee in the amount of $1,525.00 to be collected at payoff, a recording fee of $13.00 to be collected at signing. |
| 6. | All other terms of the Promissory Note and Mortgage to remain unchanged. |

The Modification Agreement describes the collateral as: 1) Lot Eighteen P-1 Block numbered One of the Estates at Tanoan[4], and 2) 8020 Rio Grande. Both Troy and Jasmine Baillio signed the Agreement, as did a bank officer. The Loan Modification

---

[4]Exhibit 29 is a partial closing statement for the purchase of this property on October 31, 2006.

Case 08-01125-s    Doc 22    Filed 04/15/11    Entered 04/15/11 17:09:58 Page 8 of 32

Agreement was filed in the Bernalillo County records on January 9, 2007 as document # 2007005371.  The Loan Modification Agreement does not purport to be a new mortgage; the borrowers do not grant or convey any interest in real estate to secure performance of the Loan Modification Agreement.  It simply refers to the existing note [sic, notes] and mortgage [sic, mortgages], states that they remain "unaffected, unchanged and unimpaired" by the modification.  The borrowers signatures indicate that they "accept the foregoing modification, and in consideration thereof, agree to pay the indebtedness evidenced by said note [sic, notes] and secured by said deed of trust [sic, mortgages], according to the terms thereof as modified and amended herein."  The Court finds that the Loan Modification Agreement was simply that, it modified the terms of the loan.  It did not amend the existing mortgages.

Exhibit 14 is a Release of Mortgage executed by HDSB on March 1, 2007 for a mortgage executed by Troy Baillio and Jasmine Baillio on October 31, 2006 for 8020 Rio Grande and filed for record in Bernalillo County as # 2006166455.  The Release of Mortgage was filed for record in the Bernalillo County records on March 7, 2007 as document # 2007036184.

Exhibit 15 is a Line of Credit Mortgage executed on October 31, 2006 between Troy and Jasmine Baillio, as husband and wife, to lender HDSB for 8020 Rio Grande.  It is the same document as

Page -9-

Exhibit 12 and contains both the October 31, 2006 County Recorder's information (document # 2006166455) as well as a new County Recorder's stamp as document # 2007061233 filed April 26, 2007. It contains the October 31, 2006 signatures, and there is no evidence or indication that either Mr. or Ms. Baillio authorized this or was aware of this filing. On the bottom right there is handwriting that says "Released in error" and has some illegible initials.

Exhibit 16 is another document titled "Mortgage Deed" dated December 26, 2006, given by JTS Properties & Investments, LLC to Alan Reeves, to secure the payment of $100,000.00 with interest thereon as provided in the note of even date. It is the same form as Exhibit 8, with the same covenants. It purports to convey an interest in 8020 Rio Grande. It is signed by a borrower without listing the capacity in which the person was signing. The signature appears to be that of Troy Baillio. It was filed for record in the Bernalillo County records on December 27, 2006 as document # 2006193383. JTS Properties & Investments, LLC had no interest in 8020 Rio Grande. This exhibit is therefore irrelevant.

Exhibit 17 is a Real Estate Mortgage Note executed by Troy Baillio, a married man, and Andrew McBride, a single man, in the amount of $40,000.00 payable to Zia Trust, Custodian for the Gregory N. Anderson IRA. The entire balance plus $4,750.00

interest is due and payable in full ninety days after the date of the note, which was April 18, 2007. The document states that it is secured by a Mortgage of same date on 8020 Rio Grande. It was filed for record in the Bernalillo County records on May 31, 2007 as document # 2007080286.

Exhibit 18 is a Mortgage executed by Troy Baillio on April 15, 2007, to Zia Trust, Custodian for the Gregory N. Anderson IRA to secure the Exhibit 17 Real Estate Mortgage Note. The collateral is 8020 Rio Grande. It was filed for record in the Bernalillo County records on May 31, 2007 as document # 2007080287.

Exhibit 19 is a Real Estate Mortgage Note executed by Troy Baillio, a married man, and Andrew McBride, a single man, in the amount of $40,000.00 payable to Zia Trust, Custodian for the Scott Garretson IRA. The entire balance plus $4,750.00 interest is due and payable in full ninety days after the date of the note, which was April 18, 2007. The document states that it is secured by a Mortgage of same date on 8020 Rio Grande. It was filed for record in the Bernalillo County records on May 31, 2007 as document # 2007080288.

Exhibit 20 is a Mortgage executed by Troy Baillio on April 15, 2007, to Zia Trust, Custodian for the Scott Garretson IRA to secure the Exhibit 19 Real Estate Mortgage Note. The collateral

Case 08-01125-s   Doc 22   Filed 04/15/11   Entered 04/15/11 17:09:58 Page 11 of 32

is 8020 Rio Grande.  It was filed for record in the Bernalillo County records on May 31, 2007 as document # 2007080289.

Exhibit 21 are Answers to Interrogatories served by Plaintiff and answered by Troy Baillio on February 9, 2010.

Exhibit 22 is a duplicate of Exhibit 12.

Exhibit 23 is a Line of Credit Mortgage executed by Troy Baillio as a married man as his sole and separate estate to Peoples Bank dated May 8, 2006.  The collateral is 8020 Rio Grande.  It was filed for record in the Bernalillo County records on May 17, 2006 as document # 2006071706.  The maximum debt limit was $700,000.00.

Exhibit 24 is a Sole and Separate Property Agreement and Conveyance executed by Troy Baillio and Jasmine Baillio on May 22, 2003 and filed for record in the Bernalillo County records on May 29, 2003 as document # 2003090336.  It states that 8020 Rio Grande is the separate property of Troy Baillio.

Exhibit 25 is a Promissory Note that is identical to Exhibit 7 in all respects, except it names the borrower as JTS Properties and Investments, LLC and there is no signature in the space provided for "Troy M. Baillio, President and LLC member."

Exhibit 26 is a Mortgage Deed that is identical to Exhibit 8 in all respects, except it names the borrower as JTS Properties and Investments, LLC and there is no signature in the space

Case 08-01125-s   Doc 22   Filed 04/15/11   Entered 04/15/11 17:09:58 Page 12 of 32

provided for "Troy M. Baillio, LLC member."  The notary information is also blank.

Exhibit 27 is a 30 year Mortgage from Troy Baillio, a "Married Man Sole and Separate" to Suntrust Mortgage, Inc. dated January 23, 2006 in the amount of $1,750,000.00 payable in monthly installments and secured by 8020 Rio Grande.  It was filed for record in the Bernalillo County records on January 27, 2006 as document # 2006012470.

Exhibit 28 is a First Community Bank account statement of account # 9294 for Troy M. Baillio or Jasmine Baillio for the period April 12, 2007 to May 13, 2007.  It shows a customer deposit on April 27, 2007 of $250,000.00.  The statement also contains information on a related savings account with about $5,000.00.

Exhibit 29 is an Estimated Statement prepared by First American Title Insurance Company for Troy and Jasmine Baillio's purchase of 10518 City Lights Drive, Albuquerque, New Mexico on October 31, 2006.  It shows a purchase price of $915,000.00 and a loan from HDSB in the amount of $920,000.00.

Exhibit 30 is a HUD Settlement Statement dated January 23, 2007 for a refinance of the City Lights property with lender National City Mortgage.  Troy Baillio is the only listed borrower.

Exhibit 31 is a statement from Chubb Insurance to Troy Baillio and Jasmine Baillio stating that effective December 12, 2006, the mortgagee for 8020 Rio Grande was changed from Peoples Bank to HDSB for an insurance policy issued by Pacific Indemnity Company for the period April 29, 2006 to April 29, 2007.

Exhibit 32 is a Release of Mortgage executed by HDSB on March 1, 2007 for a mortgage executed by Troy Baillio and Jasmine Baillio on November 2, 2006 for the City Lights property and filed for record in Bernalillo County as # 2006167545. The Release of Mortgage was filed for record in the Bernalillo County records on March 7, 2007 as # 200706182.

Exhibit 33 is a Line of Credit Mortgage executed on October 31, 2006 between Troy and Jasmine Baillio, as husband and wife, to lender HDSB for the City Lights property. It states that it will have a maximum obligation limit of $1,840,000. It secures a Promissory Note dated October 31, 2006 under the names of Troy and Jasmine Baillio in the amount of $920,000 with a maturity date of November 30, 2006. It also secures future advances. It was filed for record in the Bernalillo County records on October 31, 2006 as document # 2006166454.

Exhibit 34 is a carbon copy of a First Community Bank official check #593576889, dated April 27, 2007, remitter James R. Bernal, payable to Troy M. Baillio as "Loan proceeds" in the amount of $250,000.00.

Exhibit 35 is a document prepared by First Community Bank that states that on April 27, 2007 at 9:30:36 AM it issued a cashiers check #593576889 payable to Troy Baillio in the amount of $250,000.00 for remitter James Bernal.

Exhibit 36 is a photocopy of a money market savings account deposit to the account of Mr. Bernal of $15,000.00 on April 27, 2007.

## CHRONOLOGY[5] OF 8020 RIO GRANDE'S TITLE

| Exhibit | Party(ies) | Document | Dated | Filed | Document # |
|---------|-----------|----------|-------|-------|-----------|
| | Troy Baillio | purchases 8020 Rio Grande | 2003 | | not in evidence |
| 24 | Troy & Jasmine Baillio | Sole & Separate Prop Agt. | 05/22/03 | 05/29/03 | 2003090336 |
| 27 | Troy Baillio to Suntrust | 30 year Mortgage | 01/23/06 | 01/27/06 | 2006012470 |
| 11 | HDSB | Release of 2004 Mtg. | 02/15/06 | 02/27/06 | 2006027381 **IRRELEVANT** |
| 23 | Troy Baillio to Peoples Bank | Line of Credit Mtg. | 05/08/06 | 05/17/06 | 2006071706 |
| 12 | Troy & Jasmine Baillio to HDSB | Line of Credit Mtg. | 10/31/06 | 10/31/06 | 2006166455 (released 03/01/07) |
| 31 | Chubb Insurance | changes mortgagee Peoples to HDSB | 12/12/06 | | |

---

[5]It would have been helpful for the Court if either the exhibits were arranged in a rational order or a chronology had been presented. The Court does not have the time or desire to arrange parties' exhibits for them.

Page -15-

| Exhibit | Party(ies) | Document | Dated | Filed | Document # |
|---|---|---|---|---|---|
| 13 | Troy & Jasmine Baillio & HDSB | Loan Mod. Agreement | 12/26/06 | 01/09/07 | 2007005371 |
| 14 | HDSB | Release of Mtg. dated 10/31/06 2006166455 | 03/01/07 | 03/07/07 | 2007036184 |
| 1 | Lawyers Title Ins. Co. | Commitment | 03/27/07 | | |
| 15 | HDSB | Rerecords Line of Credit Mtg. of 10/31/06 | n/a | 04/26/07 | 2007061233 |
| 8 | Troy Baillio to Bernal | Mortgage Deed | 04/26/07 | 04/27/07 | 2007062345 |
| 18 | Troy Baillio to Zia/ Anderson | Mortgage | 04/15/07 | 05/31/07 | 2007080287 |
| 20 | Troy Baillio to Zia/ Garretson | Mortgage | 04/15/07 | 05/31/07 | 2007080289 |

**WITNESSES**

Three witnesses testified during the two days of trial. The first was David Carlberg ("Carlberg"). He now works at the University of New Mexico as a business advisor at the Small Business Development Center. In 2007 he worked for Sundance Financial, a commercial real estate loan broker, that primarily put together lenders and borrowers. He was a loan officer. He met Baillio at the end of January, 2007 when Baillio was seeking funding for a project involving condominiums in Taos, New Mexico.

Page -16-

Baillio was also attempting to buy the Simms Building, a commercial building in downtown Albuquerque. Carlberg did not end up getting a loan for Baillio for the Simms Building.

Carlberg did, however, obtain a short term loan from Bernal for Baillio. Bernal's wife is the sister of Carlberg's wife. Around mid-April, 2007, Baillio approached Carlberg and told him he was financially strapped and could not make payroll and it would shut down his Simms Building project and other projects. He needed a 30 day loan in the amount of $250,000. He also stated he needed a "hard money loan" and that he was willing to pay fees to the lender and offer security on a property being sold shortly. Baillio also produced several documents that are now Exhibits 1 through 5, which are: 1) the Lawyers Title Insurance commitment effective March 27, 2007, that showed that 8020 Rio Grande had two existing liens, one to Suntrust Mortgage and one to Peoples Bank; 2) letter from Arthur Silva at Sunwest Mortgage stating conditional approval of Andrew McBride's loan to purchase 8020 Rio Grande; 3) second letter from Arthur Silva stating that all lender conditions have been cleared and the documents were being sent to the title company for a closing on May 4, 2007; 4) a copy of the Purchase Agreement between Andrew McBride and Baillio to buy 8020 Rio Grande for $3,300,000; and 5) an appraisal report for 8020 Rio Grande dated June 26, 2006 stating a value of $3,000,000. Carlberg testified that Baillio

said "Here are the documents.  There is plenty of equity.  The
sale will go through.  I am desperate for these funds."

Carlberg next testified that he called his brother-in-law
Bernal to ask if he knew of anyone who had $250,000 to loan on a
short term basis.  Bernal stated that he might be interested.
Bernal and Carlberg met and Carlberg gave Exhibits 1 through 5 to
Bernal.

Carlberg testified that the check to him on Exhibit 6 that
says "Points" was his commission of 2 points for structuring the
deal.  He received this check at the closing of the loan on April
27, 2007.  Carlberg testified that he had prepared the Exhibit 7
Promissory Note from a form.

On cross examination, Carlberg testified that the processes
used for this loan transaction were out of the ordinary.
Normally the creditor will take an application and gather
financial information including documentation of the collateral.
In this case there was no loan application.  The only due
diligence that Carlberg did was to call Arthur Silva who told him
that they were sending the documents for 8020 Rio Grande to
closing.  Carlberg admitted that the situation was that Baillio
needed a large hard money loan in a few hours and that Baillio
was under extreme financial pressures.  Carlberg testified that
he read Exhibits 1 through 5 and saw no red flags.  Carlberg
again stated he had prepared exhibit 7, and had also prepared

exhibit 8.  He emailed both of those exhibits to Baillio, who
took them to the closing.

The second witness to testify was Plaintiff James Bernal.
He owns a convenience store.  He testified that the day before
the loan he received a call from Carlberg asking if he knew
anyone interested in making a loan that was a good deal and
included points and would be repaid.  Bernal testified that he
said he did not know anyone, but he might be interested.  Then he
testified that Carlberg "went on" about the points and how it was
secured by collateral, it was a short term deal that would close
in a short time and would be paid at closing.  Carlberg told him
it was a "good deal."  Bernal then testified that "after some
encouragement", and talking about the security and the short term
quick sale he was interested.  The next morning Bernal went to
his bank and withdrew $250,000 in the form of a cashier's check.
He had not seen any documents at this point.  Bernal testified
that he met Baillio for the first time at the closing at a title
company on April 27, 2007 at about 11:30 A.M.  Carlberg was also
present.

Bernal testified that at closing he first asked Baillio
personal information, where he was from, why he was in New
Mexico, and other "general pleasantries" to get a read on his
personality.  He asked the reason for the loan and Baillio told
him it was for cash flow needs such as payroll and taxes and

other expenses.  Baillio told him he bought properties, refurbished them and resold them for profit.  Bernal was then given Exhibits 1 through 5.  He testified that Baillio told him he would have a third position on 8020 Rio Grande and that there was $1,000,000 of equity in the property, the sale was scheduled to close on May 4, he personally knew the buyer.  He testified that Baillio gave him an appraisal (exhibit 5).

Bernal testified that he asked Baillio to verify the term of the loan, and was assured that the loan would be paid at closing on May 4, and that if need be, the loan would be paid from the Taos project or from equity in the Simms Building.  Bernal testified that "he assured me I would be repaid."

At the closing, Bernal asked for a copy of the insurance on the house and was given Exhibit 31.  It showed Peoples Bank and High Desert State Bank, which are not the two lenders on the Title Commitment (exhibit 1).  Baillio told him that High Desert State Bank was Peoples Bank.

Bernal testified that the sale never closed and he was never repaid.  In May Baillio gave him a post-dated check, but it never cleared.  Eventually Bernal sued Baillio and obtained a default judgment.  He said that then Baillio entered bankruptcy and then 8020 Rio Grande was foreclosed on and he got nothing.

Bernal was next asked why he would loan $250,000 on a house with prior mortgages against it.  He answered that he had been

Case 08-01125-s   Doc 22   Filed 04/15/11   Entered 04/15/11 17:09:58 Page 20 of 32

told repeatedly by his brother-in-law that it was a good deal and he would be repaid. He thought it seemed like a secure deal and he knew his brother-in-law needed the commission.

On cross examination Bernal affirmed that the only documents he had seen before closing were Exhibits 1 through 5 and 31. He affirmed that Carlberg told him that this was a good deal. When asked, he said that he saw that the house was selling for $3.3 million and that the appraised value was $3.3 million[6] and he assumed the appraisal was a current one because that's what the house was selling for[7]. He believed there were only two liens because the Title Commitment listed two and Baillio told them there were only two. He admitted that, to the date of trial, he did not know the amount of any liens that actually were on the property.

On cross examination he also affirmed that he knew that Carlberg was having financial constraints and stated "I had a sense he could use $5,000." He also admitted that Carlberg was "eager" to get him involved with this loan.

On redirect Bernal clarified that it was Carlberg that told him there was over $1,000,000 in equity in the property.

---

[6]The appraisal actually states the value as $3,000,000.

[7]The appraisal clearly states the effective date as June 26, 2006.

The third witness was Troy Baillio called as an adverse
witness.  In 2006 and 2007 he was buying and selling real estate.
He testified that he disagreed with Bernal's overall description
of the closing.  He stated that the entire process took about
thirty minutes and they did not discuss things, they just signed
the documents.

Next, Baillio testified that the Promissory Note and
Mortgage Deed were actually forms on his computer that he emailed
to Carlberg, who inserted all the numbers.

Regarding 8020 Rio Grande, several brokers were aware that
Baillio was trying to sell his house and knew that McBride had
just sold his house and was looking to replace it.  They steered
McBride to Baillio's real estate agent Dale Scott who in turn
sent him to Baillio.  In October 2006 McBride and Baillio started
talking about a sale and purchase, both of the house and all its
furnishings.  Baillio then went out and purchased the City Lights
property.  Sometime around late December 2006 they arrived at a
price of $3,300,000 but did not put it into writing until April,
2007.  Baillio moved to the City Lights property in late January.
That week he also let McBride move into 8020 Rio Grande, without
any contract or written agreement, "because he showed a lot of
money in the bank."

When May 4, 2007 came the sale did not close.  Baillio
testified that he was not sure why.  One possible reason was that

it did not appraise for $3,300,000 but only $3,000,000. Baillio
stated that he was willing to drop the price, but then McBride
could not get a loan. Baillio then testified that about a week
after the sale did not close he was contacted by McBride's real
estate broker and asked to allow McBride to put liens against the
house for $100,000 so he could come up with $100,000 cash for a
closing. Baillio stated that he allowed him to do this.
Exhibits 18 and 19 are two mortgages on 8020 Rio Grande dated
April 18, 2007. Baillio testified that these were two of the
three liens he granted and that the date is incorrect. Baillio
was positive that they should have been dated May 18, 2007,
because the idea behind these only came up after the failure to
close on May 4, 2007. The Court finds this testimony credible.
It is also supported by the recording date, May 31, 2007.
Baillio testified that he signed these notes and mortgages and
that McBride got the money, but McBride still did not close. At
this point Baillio refused to deal with McBride any longer, and
McBride moved out of 8020 Rio Grande.

Baillio next testified about the City Lights property. He
borrowed $920,000 from HDSB to purchase it in October 2006. He
testified that the collateral was both City Lights and 8020 Rio
Grande, but he was not sure how that happened. When shown
Exhibit 12 (October 31, 2006 joint mortgage to HDSB on 8020 Rio
Grande) Baillio was confused and stated he believed it had been a

mortgage on City Lights, which was jointly purchased with Jasmine on October 31, 2006, the same date as the mortgage. He also stated that City Lights was the only jointly held property and she would not have had to sign a mortgage on 8020 Rio Grande. Furthermore, he could not recall signing any other mortgage documents on City Lights.

On cross examination, Baillio testified that he prepared Exhibits 25 and 26, the Promissory Note and Mortgage Deed that was from JTS Properties and Investments, LLC. He emailed them to Carlberg, who changed the identity of the borrower to Baillio. Carlberg then brought the documents to closing and the changed ones were used. This is reasonable, considering that title to 8020 Rio Grande was in Baillio.

He next testified that he believed McBride had financing in place right up to the date of closing. On the day of closing, the appraisal [not in evidence] came in $100,000 short. He also testified that he never would have bought his current residence if he had not thought that 8020 Rio Grande would close.

Baillio also testified that he and McBride borrowed the $100,000 in May to allow McBride to close. He did not know why they had done it the way they did, but he believed it accomplished what he was trying to do: to drop the price by $100,000. He also affirmed that these borrowings and related liens were done on May 18, 2007.

Baillio testified that he did not know that HDSB had rerecorded the mortgage it released; he stated "They didn't ask me or tell me." The Court finds this credible. It appears from Exhibit that someone at HDSB realized they had released the mortgage in error, wrote that on the copy of the originally filed mortgage, and refiled it the day before Baillio executed the Mortgage Deed to Bernal.

Baillio reaffirmed his earlier testimony that the liens involving Zia Trust were signed after the Bernal note. It was not until late May that he finally realized that the 8020 Rio Grande sale to McBride would not close.

Baillio testified that he never promised a property in Taos as a source of repayment to Bernal. He stated that Carlberg knew that he had never purchased the Taos property and forfeited his $50,000 earnest money on it, and that Carlberg was present during the entire closing and would have known that any such statement was false.

On redirect Baillio was asked why he had prepared Exhibits 25 and 26 in the name of JTS Properties and Investments, LLC. He testified that he owned JTS, and the money was going to JTS, so he prepared the documents in JTS's name. When asked if he knew the difference, he answered "I do now. It was my understanding that if JTS was going to use the money they had to borrow it." On redirect he also elaborated on the May liens; Silva prepared

them and Baillio signed them hoping that 8020 Rio Grande would close. He stated "they told me to."

At this point Plaintiff rested. The second day of trial was of Defendant's case and consisted of testimony of Baillio and Bernal. The first witness was Baillio.

Baillio testified that at the time of the Bernal loan he believed there was $1,000,000 equity in 8020 Rio Grande, calculated as follows: $3,200,000 purchase price[8] less mortgages in the amount of $1,750,000[9], $350,000[10] and $100,000[11] equals equity of $1,000,000.

Defendant's next witness was Bernal. He testified that he was sued in the foreclosure of 8020 Rio Grande. He believed his attorney filed an answer, but he did not recall what the property sold for at the special master's sale. He believed the JTS mortgage to Reeves on 8020 Rio Grande was valid because Baillio was a principal of JTS.

---

[8]Actually, exhibit 4 shows a purchase price of $3,300,000.

[9]See Exhibit 1.

[10]Id.

[11]See Exhibit 16. Although Baillio testified that he now understood the difference between a corporate asset or debt and a personal asset or debt it appears he still does not fully grasp that he does not owe JTS's debts and JTS does not own his real estate.

Defendant rested.  Plaintiff put on rebuttal that introduced

Exhibits 34, 35 and 36.  These establish that the closing of the

Bernal loan actually took place on April 27, 2007.

## DISCUSSION

> In general, after an individual debtor files for
> chapter 7 bankruptcy, the bankruptcy court discharges
> all of the debtor's pre-existing obligations, absent
> the applicability of a statutory exception.  See 11
> U.S.C. § 523(a)  (identifying nineteen statutory
> exceptions to discharge).  Because exceptions to
> discharge are narrowly construed in favor of the debtor
> in an effort to further the "fresh start" policy
> underlying the Bankruptcy Code, the creditor asserting
> an exception to discharge must show that its claim
> "comes squarely within an exception enumerated in
> Bankruptcy Code § 523(a)."  See Century 21 Balfour Real
> Estate v. Menna (In re Menna), 16 F.3d [7] at 9 [(1st
> Cir. 1994)]; see also McCrory v. Spigel (In re Spigel),
> 260 F.3d 27, 32 (1st Cir.2001); Palmacci [v. Umpierrez
> (In re Umpierrez)], 121 F.3d [781] at 786 [(1st Cir.
> 1997)].
>
> > Pursuant to § 523(a)(2), some debts incurred as a
> result of the debtor's fraudulent actions or statements
> are excepted from discharge.  See 11 U.S.C. §
> 523(a)(2).  Specifically, § 523(a)(2)(A) excepts from
> discharge debts obtained by "false pretenses, a false
> representation, or actual fraud, other than a statement
> respecting the debtor's or an insider's financial
> condition."  11 U.S.C. § 523(a)(2)(A).  Section
> 523(a)(2)(B), on the other hand, bars the discharge of
> a debt obligation obtained by a false written statement
> "respecting the debtor's ... financial condition."  See
> 11 U.S.C. § 523(a)(2)(B).  Based on this statutory
> language, discharge claims based on fraudulent written
> statements concerning a debtor's financial condition
> must be brought pursuant to § 523(a)(2)(B), not §
> 523(a)(2)(A).

Douglas v. Kosinski (In re Kosinski), 424 B.R. 599, 607-08 (1st

Cir. BAP 2010) (footnote omitted).  There was no evidence

presented about an alleged false financial statement, therefore Plaintiff's cause of action is under Section 523(a)(2)(A).

To establish that a claim is non-dischargeable under section 523(a)(2)(A) the creditor must prove the following by a preponderance of the evidence: (1) the debtor made a false representation; (2) the debtor made the representation with the intent to deceive the creditor; (3) the creditor relied on the representation; (4) the creditor's reliance was reasonable[12]; and (5) the debtor's representation caused the creditor to sustain a loss. <u>Fowler Bros. v. Young (In re Young)</u>, 91 F.3d 1367, 1373 (10th Cir. 1996). The Court finds that Plaintiff has failed to meet its burden of proof on every element.

First, the Court does not find any false representations. It appears that from all information available to Baillio, Bernal's lien was to be in third position. The table on pages 15 and 16 shows that there were two mortgages, to Suntrust and Peoples, in place. HDSB had a mortgage, but released in on March 1, 2007. The Title Commitment showed these two mortgages. Baillio was unaware that the day before the Bernal transaction HDSB rerecorded its mortgage.

Bernal did not prove that Baillio stated the house had been appraised at $3,300,000 or more. The only evidence is Exhibit 5,

---

[12]The United States Supreme Court ruled that for section 523(a)(2)(A) the reliance must only be "justifiable." <u>Field</u>, 516 U.S. at 74-75.

Page -28-

which is the appraisal the witnesses agreed Baillio gave to
Carlberg.  It shows a value of $3,000,000.

Debtor believed he had over $1,000,000 equity in the home,
even deducting for the invalid JTS mortgage for $100,000.  This
was not a false representation.

Debtor believed, and all documents demonstrate, that the
house was under contract to sell for $3,300,000 on May 4, 2007 to
a qualified buyer.  This was not a false representation.

Bernal did not meet his burden of proof of showing that
Baillio falsely stated that he had alternative sources of
repayment if the house did not close.

Bernal suggested that Baillio lied about Peoples Bank
becoming HDSB but offered no evidence on whether this was a false
statement or not.

Second, because the Court cannot find any false
representations the Court cannot find a related intent to
deceive.

Third, Bernal did not meet his burden of proof of showing
that he, in fact, relied on anything Baillio said or produced.
The Court believes that he in fact relied on Carlberg's opinion
that this was such a great deal, safe, with a high return.  This
conclusion is evidenced in part by the fact that Bernal withdrew
$250,000 from his accounts and showed up at closing without
seeing a single document or having a clue about who Baillio was

or what he did.  It appears that his decision was made based
solely on what Carlberg told him, and that when he appeared at
closing he was already prepared to advance the funds.

Fourth, the Court does not find any reliance justifiable.
Carlberg was a loan officer and knew the procedures for reducing
risk such as taking applications and verifying information.  The
Court is not suggesting that those procedures had to be followed
in this case, which was an urgent situation.  However, Baillio
was an unknown and $250,000 is a significant amount of money.
There were also a few red flags that suggested further inquiry
might be called for.  Exhibit 2 shows that Sunwest conditionally
approved McBride on the condition that the appraisal come in at
$3,100,000 and the maximum loan would be $2,635,000.  Exhibit 4
shows the Purchase Agreement called for a loan of $2,805,000.
Exhibit 5 is a slightly out of date appraisal for $3,000,000.
Another red flag was the high interest rate[13].  The deal was too
good to be true[14].  As the facts present themselves, however,

---

[13]The face amount of the loan was $250,000 but Baillio had
to pay $20,000 of "points" up front, so he received $230,000.
The loan was made on April 27, 2007 and was to be paid at closing
on May 4, 2007, which is eight days later.  Therefore, eight days
of interest was $20,000.  One day of interest would then be
$2,500.  One 365 day year of interest would be $912,500.  This
interest rate is 396% (912,500 ÷ 230,000).

[14]See Johnson v. Curtis (In re Curtis), 2006 WL 1506209 at
*10 (Bankr. C.D. Ill. 2006)(Promises of high returns – in this
case 100% in 15 days – on investments that seem too good to be
true usually turn out to be too good to be true.)(Citing U.S. v.
(continued...)

there is no indication that an investigation would have shown that McBride would not close on May 4, 2007.

Finally, any representation made by Baillio did not cause Bernal to sustain a loss.

> As <u>Field</u> teaches, § 523(a)(2) requirements must be
> determined under common law tort principles.  For this
> reason, a damage requirement is uniformly read into §
> 523(a)(2)(A), even though no express inclusion of such
> a requirement appears in the text of that Code section.
> We attribute the presence of the requirement that
> "resulting injury" proximately caused by alleged
> fraudulent conduct is included as a requirement in a §
> 523(a)(2)(A) claim to the fact that this is an element
> which is necessary for the proof of common law fraud
> generally.

<u>Woodstock Housing Corp. v. Johnson (In re Johnson)</u>, 242 B.R. 283, 292 (Bankr. E.D. Pa. 1999).  The real cause of the loss was McBride's failure to qualify for his mortgage and, possibly, HDSB's rerecording its mortgage without telling Baillio.

### SUMMARY

For the reasons set forth above, the Court finds that Judgment should be entered for Defendant Troy Baillio.  In addition, there was no evidence that Jasmine Baillio had anything to do with this transaction and Judgment should be entered for her as well.

---

[14](...continued)
<u>Frykholm</u>, 362 F.3d 413, 414 (7th Cir.), <u>cert. denied</u>, 543 U.S. 928 (2004)(Ponzi scheme)).



Honorable James S. Starzynski
United States Bankruptcy Judge

Date Entered on Docket:  April 15, 2011
Copies to:

Daniel J Behles
Moore, Berkson & Gandarilla, P.C.
P.O. Box 7459
Albuquerque, NM 87194

George M Moore
Moore, Berkson & Gandarilla, P.C.
PO Box 7459
Albuquerque, NM 87194